IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs August 3, 2020

## IN RE MEGHAN M. R.

**Appeal from the Juvenile Court for Campbell County**
**No. 2019JC6      Amanda Sammons, Judge**

_____

### No. E2020-00023-COA-R3-PT

_____

A trial court terminated the parental rights of a mother based on the grounds of abandonment by failure to visit, abandonment by failure to provide a suitable home, substantial noncompliance with permanency plans, persistence of conditions, and failure to manifest an ability and willingness to assume custody. The mother appealed, and we affirm the termination on all grounds.

**Tenn. R. App. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**

ANDY D. BENNETT, J., delivered the opinion of the Court, in which CARMA DENNIS MCGEE, and KRISTI M. DAVIS, JJ., joined.

William Wesley Brooks, Tazewell, Tennessee, for the appellant, P. R.

Herbert H. Slatery, III, Attorney General and Reporter, and Stephanie Renee Reevers, Deputy Attorney General, for the appellee, Tennessee Department of Children's Services.

### OPINION

#### I. FACTUAL AND PROCEDURAL BACKGROUND

Meghan R. was born to P. R. ("Mother") and R. F. P. ("Father") in 2009. In April 2018, when Meghan was nine years old, she was placed into the temporary custody of the Tennessee Department of Children's Services ("DCS" or "the Department") after Mother was arrested for shoplifting.[1] During an interview with a DCS employee shortly after Mother's arrest, Meghan reported that her family had been transient for six to seven weeks and had been living in motels in several different cities in Tennessee and Kentucky. Meghan did not attend school during this six to seven-week period. Earlier in the year,

---

[1]Father was incarcerated for another offense when Mother was arrested for shoplifting.

before Mother's arrest, DCS had received "multiple referrals" alleging substance abuse and domestic violence in the family's home.

The Department created family permanency plans on May 3, 2018, December 4, 2018, and May 14, 2019. The plans' goals were returning Meghan to her parents or, if that was not feasible, adoption. The Department filed a petition to terminate Mother's and Father's parental rights on January 10, 2019. The grounds DCS asserted against Mother included abandonment by failure to visit, abandonment by failure to provide a suitable home, substantial noncompliance with permanency plans, persistent conditions, and failure to manifest an ability and willingness to assume custody. Father did not contest the termination of his rights during trial and did not file an appeal. Thus, we will not address the grounds DCS asserted against Father or the trial court's termination of Father's parental rights.

A trial was held on October 11, 2019. Witnesses included two DCS family service workers, Mother, and Meghan's foster mother. Crystal Hill was a family service worker ("FSW") from DCS who worked with Mother and Meghan from the time Meghan was removed from her parents' custody until August 2018, when Emely Ford took over as the FSW of the case. Ms. Hill supervised two visits Mother had with Meghan during the four months Ms. Hill was assigned to the case. A third visit was scheduled, but Ms. Hill testified that Mother called on July 6, 2018, to cancel that visit. Mother underwent an alcohol and drug ("A&D") and mental health assessment while she was incarcerated for shoplifting; Ms. Hill did not believe Mother followed the recommendations resulting from either of those assessments. Ms. Hill was not aware of any other requirements of the first permanency plan that Mother satisfied.[2] A recommendation from the A&D assessment was that Mother enroll in an intensive outpatient therapy program ("IOP"). Although Ms. Hill remembered providing Mother with a phone number to call about an IOP, she did not think Mother completed an IOP program.

Emely Ford worked for DCS as an FSW, and she took over the case from Ms. Hill in early August 2018. Ms. Ford testified that she attempted to visit Mother and Father at their home in mid-August, but the address Mother gave her was not valid. Ms. Ford spoke with Father in her attempt to locate Mother, and Father informed Ms. Ford that Mother had left him and was seeing another man who "sells dope."

Ms. Ford testified that she held a child and family team meeting ("CFTM") on August 23, 2018, and that Mother participated in this meeting by telephone. Ms. Ford asked Mother where she was living, and Mother told her that "she did not know the address

---

[2]Following her incarceration for shoplifting, Mother lived with a grown daughter for a period of time, but Ms. Hill testified that this grown daughter had a "history of assaultive behaviors" and her home would not have been deemed an appropriate home for Meghan.

and would have to ask the landlord." Ms. Ford arranged for Mother to have a hair follicle test done in late August or early September 2018, but Mother did not show up for this test. Ms. Ford scheduled another CFTM for September 14, 2018. Ms. Ford testified that she informed Mother about this meeting but that Mother did not participate in the CFTM on that date.

Ms. Ford testified that she informed Mother that she was entitled to have visits with Meghan, and Ms. Ford applied for funding to cover Mother's transportation costs. According to Ms. Ford, Mother did not have any visits with Meghan or make any attempts to contact Meghan in the four months before DCS filed its petition to terminate Mother's parental rights. Ms. Ford testified that Mother was informed that failing to visit Meghan could result in the termination of her parental rights. Ms. Ford acknowledged that Mother spoke with Meghan by telephone on Meghan's birthday, which was after DCS filed its petition to terminate Mother's rights.

Ms. Ford testified about Mother's requirements under the permanency plans and stated that she asked Mother multiple times whether she needed help completing any of the plans' steps. Ms. Ford asked Mother to come in to the DCS office for a random drug screen on October 30, 2018, February 4, 2019, and February 25, 2019. Mother refused to come in for any of these screens. On April 15, 2019, Mother admitted to Ms. Ford that she had used methamphetamine. Mother came in for drug tests on August 15 and September 10, 2019, and the results of both of these tests were negative for drug use. On September 12, 2019, however, Mother tested positive for benzodiazepenes and oxycodone.[3]

Ms. Ford testified that she telephoned Mother on October 30, 2018, and asked Mother to come in to the DCS office to go over the permanency plan. Ms. Ford testified that Mother said she could not come in and that she was going to be homeless two days later. Ms. Ford tried to set up a different date to review the permanency plan, but Mother would not agree to another date. On November 13, 2018, Ms. Ford held another CFTM, and Mother participated in this meeting by telephone. Mother contacted Ms. Ford on December 20, 2018, to say she was trying to enroll in parenting classes, but as far as Ms. Ford was aware, Mother did not complete these classes. Ms. Ford testified that she did not know of any requirements under the permanency plans that Mother had completed. When asked what Mother's "current status" was at the time of trial, Ms. Ford responded:

The last time I had talked with [Mother], she was staying with her mother and she was working with the Homeless Coalition to try to find housing.

---

[3]Mother's attorney elicited testimony from Mother that she had undergone a medical procedure shortly before the drug screen on September 12, 2019, and that the anesthesia used for the procedure may have explained the positive drug test. No evidence was introduced, however, showing that the medications Mother may have received in the hospital included benzodiazepenes or oxycodone.

Neither [Mother nor Father] have income at this time. Transportation is still an issue.

Ms. Ford testified that Mother contacted her in January 2019 asking for help finding a domestic violence shelter. Mother told Ms. Ford that she was scared of her boyfriend and that he "was not nice, was mean to her." This same boyfriend accompanied Mother to court on the day of the trial. Ms. Ford stated that as of the time of trial, she did not believe Mother had addressed her substance abuse issues or made any child support payments.

Ms. Ford described how Meghan was doing in her foster home:

Meghan is doing exceptionally well in her foster home. Meghan has straight A's. Meghan is participating in all kind of different sports. When Meghan first came -- came into custody, she was a very anxious child. That has subsided. She is a very sassy, outgoing ten year old. Meghan is very bonded to the foster mother and the foster mother's family. They're all one big tight-knit family and they help each other out.

. . . .

Meghan has told me directly that she wants to be adopted. Meghan has already picked out her new name that she wants it to be when she's adopted. Meghan loves where she's at. She loves her school. She loves the fact that she lives in a calm house and that nobody's fighting, and that was directly from her.

Ms. Ford testified that Mother had begun visiting with Meghan following the Department's filing of the termination petition and that the visits had a negative effect on Meghan. Ms. Ford explained:

Meghan was anxious after the visits . . . . Her and her foster mother had decided to be - - eat healthier and they had thrown some junk food in the trash. And Meghan had got it out of the trash can [following a visit with Mother] and was going to take it for school lunch. And as soon as she did it, she went to the foster mom and told her that she was sorry and that she knew it was not good. And then after the visits [with Mother] stopped again, she was back to her normal self.

Mother confirmed in her testimony that she did not visit Meghan or write her any letters in the four months before DCS filed its termination petition. When asked whether she completed any steps outlined in the permanency plans, Mother responded that she had an A&D assessment done shortly after Meghan was removed from her custody. She acknowledged that outpatient therapy had been recommended and that she had failed to

complete this recommendation. Mother stated that she had another A&D assessment done in July 2019 and that it was again recommended that she attend "outpatient mental health counseling." As of the time of trial, Mother testified that she was receiving regular therapy for mental health, but not intensive outpatient therapy to address any substance abuse. When Mother was asked why she had not availed herself of substance abuse treatment, she responded, "There's no proof that I'm a drug addict."

Mother admitted that she failed to provide DCS with proof of housing, proof of income, or proof of transportation. Mother testified about her employment since the time Meghan was removed from her custody. She stated that she worked at an amusement park in Gatlinburg for about a month in or around December 2018 and at a motel in Lenoir City from the end of April to the beginning of June 2019. Mother acknowledged that she "picked up criminal charges in Loudon County" for receiving stolen property in June 2019. The record contains a certified copy of this criminal charge, indicating that Mother was arrested for "theft of property."

Mother's attorney asked Mother to explain to the judge why she should be able to regain custody of Meghan. Mother replied:

> Because I'm getting housing. I'm getting the mental health that I should have got a long time ago from suffering from PTSD. And that's improved. Even my therapist said that I was improving. You could see that there was improvements since I've been coming there. And I'm trying to get my disability. If that gets denied, I mean, I can go back to work, you know, just certain things I can't do due to my back injury. You know, I have degenerative back disease. But transportation, I mean, I'm in the process of getting a vehicle. So, I mean, I can use public transportation until then. I mean, I love her. You know, that's my daughter.

Meghan's foster mother testified that she was interested in adopting Meghan. The foster mother described Meghan's behavior when Meghan was first placed with her after entering DCS custody: "She was very quiet, very nervous, scared. She would use the bathroom on herself. Took food from the fridge when she wasn't supposed to." The foster mother said that after living with her for a year and a half, Meghan was now "completely different":

> She's very happy. She doesn't get anxious about things anymore. She just kind of goes with the flow. Doesn't have like that nervous energy about her anymore. She's healthier. She's lost about twenty-five pounds. Just happy to go to school. Happy to get up. She has friends. Just enjoys her life at home. . . . Right now she is doing running club, clogging, and school choir. In the summer she does swimming and in the spring she does softball.

The foster mother identified a letter addressed to the judge that Meghan had handwritten. The foster mother explained that she did not direct Meghan to write this letter; Meghan decided to write it on her own. The letter was introduced into evidence, and it stated, in pertinent part:

> Dear Judge, I am very happy living with [my foster mother]. I want her to adopt me. I get to do lots of activities I did not get to do before. I feel safe here and I like my new school. Thank you for reading my letter.

After the close of evidence the trial court announced its decision from the bench terminating Mother's rights and followed up its oral ruling with a written order dated December 6, 2019. The court addressed each ground for termination and concluded that clear and convincing evidence existed to support the grounds of abandonment by failure to visit, abandonment by failure to provide a suitable home, substantial noncompliance with the permanency plans, persistence of conditions, and failure to manifest an ability and willingness to assume custody of Meghan. The court then conducted a best interest analysis and concluded the evidence clearly and convincingly showed that it was in Meghan's best interest to terminate Mother's parental rights.

Mother appeals, arguing that the evidence did not clearly and convincingly show that she willfully failed to visit Meghan in the four months before DCS filed its termination petition. She also argues that the trial court failed to make sufficient findings of fact and conclusions of law to support the termination of her rights under the other grounds or to support its best interest analysis. The Department raises no other issues on appeal.

## II. STANDARD OF REVIEW

The Tennessee Supreme Court has described the appellate review of parental termination cases as follows:

> An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). Under Rule 13(d), appellate courts review factual findings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. Additionally, all other questions of law

in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness.

*In re Carrington H.*, 483 S.W.3d 507, 523-24 (Tenn. 2016) (citations omitted); *see also In re Gabriella D.*, 531 S.W.3d 662, 680 (Tenn. 2017).

The termination of a parent's rights is one of the most serious decisions courts make. As the United States Supreme Court has said, "[f]ew consequences of judicial action are so grave as the severance of natural family ties." *Santosky v. Kramer*, 455 U.S. 745, 787 (1982). "Terminating parental rights has the legal effect of reducing the parent to the role of a complete stranger," *In re W.B., IV*, Nos. M2004-00999-COA-R3-PT, M2004-01572-COA-R3-PT, 2005 WL 1021618, at *6 (Tenn. Ct. App. Apr. 29, 2005), and of "severing forever all legal rights and obligations of the parent or guardian," Tenn. Code Ann. § 36-1-113(l)(1).

A parent has a fundamental right, based in both the federal and state constitutions, to the care, custody, and control of his or her own child. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174-75 (Tenn. 1996) (citing *Nale v. Robertson*, 871 S.W.2d 674, 678 (Tenn. 1994)); *In re Adoption of Female Child*, 896 S.W.2d 546, 547-48 (Tenn. 1995) (citing *Hawk v. Hawk*, 855 S.W.2d 573, 577 (Tenn. 1993)). This right "is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions." *In re Carrington H.*, 483 S.W.3d at 521 (citing U.S. CONST. amend. XIV, § 1; TENN. CONST. art. 1, § 8). While this right is fundamental, it is not absolute. *Id.* at 522. The State may interfere with parental rights in certain circumstances. *Id.* at 522-23; *In re Angela E.*, 303 S.W.3d at 250-51. Our legislature has listed the grounds upon which termination proceedings may be brought. *See* Tenn. Code Ann. § 36-1-113(g). Termination proceedings are statutory, and a parent's rights may be terminated only where a statutory basis exists. *In re Angela E.*, 303 S.W.3d at 250; *Osborn v. Marr*, 127 S.W.3d 737, 739 (Tenn. 2004); *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002); *In re M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998).

To terminate parental rights, a court must find by clear and convincing evidence the existence of at least one of the statutory grounds for termination and that termination is in the child's best interest. Tenn. Code Ann. § 36-1-113(c); *In re Kaliyah S.*, 455 S.W.3d 533, 552 (Tenn. 2015); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). "'Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings.'" *In re Carrington H.*, 483 S.W.3d at 522 (quoting *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010) (citations omitted)). "Evidence satisfying the clear and convincing evidence standard establishes that the truth of the facts asserted is highly probable." *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005). As a reviewing court, we "must 'distinguish between the specific facts found by the trial court and the

combined weight of those facts.'" *In re Keri C.*, 384 S.W.3d 731, 744 (Tenn. Ct. App. 2010) (quoting *In re Tiffany B.*, 228 S.W.3d 148, 156 (Tenn. Ct. App. 2007)). Then, we must determine "whether the combined weight of the facts . . . clearly and convincingly establishes all of the elements required to terminate" a parent's rights. *Id.* "When it comes to live, in-court witnesses, appellate courts should afford trial courts considerable deference when reviewing issues that hinge on the witnesses' credibility because trial courts are 'uniquely positioned to observe the demeanor and conduct of witnesses.'" *Kelly v. Kelly*, 445 S.W.3d 685, 692 (Tenn. 2014) (quoting *State v. Binette*, 33 S.W.3d 215, 217 (Tenn. 2000)).

Once a ground for termination is established by clear and convincing evidence, the trial court or the reviewing court conducts a best interests analysis. *In re Angela E.*, 303 S.W.3d at 251. "The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." *Id.* at 254. The existence of a ground for termination "does not inexorably lead to the conclusion that termination of a parent's rights is in the best interest of the child." *In re C.B.W.*, No. M2005-01817-COA-R3-PT, 2006 WL 1749534, at *6 (Tenn. Ct. App. June 26, 2006).

## III. ANALYSIS

### A. Grounds for Termination

#### 1. Abandonment by Failure to Visit

One ground for terminating a parent's rights is abandonment, as that term is defined in Tenn. Code Ann. § 36-1-102. Tenn. Code Ann. § 36-1-113(g)(1). The Department alleged that Mother abandoned Meghan by failing to visit her within the four months preceding the date it filed its termination petition. The Department filed its termination petition on January 10, 2019. Thus, the relevant four-month period is September 10, 2018, through January 9, 2019. *See In re Jacob C.H.*, No. E2013-00587-COA-R3-PT, 2014 WL 689085, at *6 (Tenn. Ct. App. Feb. 20, 2014) (explaining that statutory four-month period covers four months preceding day termination petition was filed and does not include day petition was filed).

When DCS filed its petition, "abandonment" was defined, in relevant part, as follows:

> For a period of four (4) consecutive months immediately preceding the filing of a proceeding, pleading, petition, or any amended petition to terminate the parental rights of the parent or parents or the guardian or guardians of the child who is the subject of the petition for termination of parental rights or adoption, that the parent or parents or the guardian or guardians either have

failed to visit or have failed to support or have failed to make reasonable payments toward the support of the child.

Tenn. Code Ann. § 36-1-102(1)(A)(i). The statute defines the phrase "failed to visit" as:

the failure, for a period of four (4) consecutive months, to visit or engage in more than token visitation. That the parent had only the means or ability to make very occasional visits is not a defense to failure to visit if no visits were made during the relevant four-month period.

*Id.* § 36-1-102(1)(E).

The statute defining abandonment by failing to visit was amended in 2018, and a petitioner is no longer required to prove that a parent in a termination proceeding acted "willfully" in failing to visit her child.[4] However, the respondent may assert as an affirmative defense that her failure to visit or support was not "willful." Under the current statute,

For purposes of this subdivision (1), it shall be a defense to abandonment for failure to visit or failure to support that a parent or guardian's failure to visit or support was not willful. The parent or guardian shall bear the burden of proof that the failure to visit or support was not willful. Such defense must be established by a preponderance of evidence. The absence of willfulness is an affirmative defense pursuant to Rule 8.03 of the Tennessee Rules of Civil Procedure[.]

*Id.* § 36-1-102(1)(I). Because willfulness is an affirmative defense, the burden of proof is on Mother to establish that her failure to visit was not willful. *See In re Kolton C.*, No. E2019-00736-COA-R3-PT, 2019 WL 6341042, at *5 (Tenn. Ct. App. Nov. 26, 2019); *In re Nicholas C.*, No. E2019-00165-COA-R3-PT, 2019 WL 3074070, at *13 (Tenn. Ct. App. July 15, 2019).

"Willful conduct consists of acts or failures to act that are intentional or voluntary rather than accidental or inadvertent." *In re Audrey S.*, 182 S.W.3d at 863. We have previously stated that "willfulness" does not "require malevolence or ill will." *Id.*

Conduct is "willful" if it is the product of free will rather than coercion. Thus, a person acts "willfully" if he or she is a free agent, knows what he or she is doing, and intends to do what he or she is doing.

---

[4]Until July 1, 2018, the petitioner was required to prove that the respondent "ha[s] willfully failed to visit or ha[s] willfully failed to support or ha[s] willfully failed to make reasonable payments toward the support of the child." Tenn. Code Ann. § 36-1-102(1)(A)(i) (2017).

Failure to visit or support a child is "willful" when a person is aware of his or her duty to visit or support, has the capacity to do so, makes no attempt to do so, and has no justifiable excuse for not doing so. Failure to visit or to support is not excused by another person's conduct unless the conduct actually prevents the person with the obligation from performing his or her duty, or amounts to a significant restraint of or interference with the parent's efforts to support or develop a relationship with the child[.]

*Id.* at 863-64 (citations omitted); *see also In re Adoption of Angela E.*, 402 S.W.3d 636, 640 (Tenn. 2013) ("A parent cannot be said to have abandoned a child when his failure to visit or support is due to circumstances outside his control."); *In re Kolton C.*, 2019 WL 6341042, at *5.

The trial court determined that DCS proved this ground by clear and convincing evidence. The court found that "[Mother] testified that she did not visit the child during the relevant time period" and that "FSW Ford testified that [during] the four months prior to the filing of the Petition for Termination of Parental Rights, [Mother] did not visit the [child]. The mother was not in jail or incapacitated in any way." Ms. Ford testified that she attempted to arrange therapeutic visits during this four-month period, but the provider of these services was unable to reach Mother to schedule the visits.

Mother argues in her appellate brief that the Department failed to show that her failure to visit was "willful." As explained above, however, the relevant statute was amended in 2018 with the result that Mother had the burden of proving at trial that her failure to visit Meghan was not willful. This she failed to do. The record supports the trial court's findings of fact. As a result, we affirm the trial court's conclusion that DCS established the ground of abandonment by failure to visit by clear and convincing evidence.

2. Abandonment by Failure to Provide Suitable Home

Abandonment by failing to provide a child with a suitable home is another ground for terminating a parent's rights in Tennessee. Tennessee Code Annotated section 36-1-102(1)(A)(ii) defines this form of abandonment as follows:

(*a*) The child has been removed from the home or the physical or legal custody of a parent or parents or guardian or guardians by a court order at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and the child was placed in the custody of the department or a licensed child-placing agency;

(*b*) The juvenile court found, or the court where the termination of parental rights petition is filed finds, that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and

(*c*) For a period of four (4) months following the physical removal, the department or agency made reasonable efforts to assist the parent or parents or the guardian or guardians to establish a suitable home for the child, but that the parent or parents or the guardian or guardians have not made reciprocal reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date. The efforts of the department or agency to assist a parent or guardian in establishing a suitable home for the child shall be found to be reasonable if such efforts equal or exceed the efforts of the parent or guardian toward the same goal, when the parent or guardian is aware that the child is in the custody of the department[.]

This ground for termination requires DCS to make reasonable efforts to assist the parent in obtaining a suitable home. Tenn. Code Ann. § 36-1-102(1)(A)(ii)(*c*); *In re Kaliyah S.*, 455 S.W.3d 533, 555 n.32 (Tenn. 2015). For purposes of this statute, a "suitable home" requires both a "'proper physical living location'" and that the home "'be free of drugs and domestic violence.'" *In re Navada N.*, 498 S.W.3d 579, 595 (Tenn. Ct. App. 2016) (quoting *In re Hannah H.*, No. E2013-01211-COA-R3-PT, 2014 WL 2587397, at *9 (Tenn. Ct. App. June 10, 2014)). It requires a "safe and stable environment in which a child can live and 'the presence of a care giver who can supply the care and attention a child needs.'" *In re James V.*, No. M2016-01575-COA-R3-PT, 2017 WL 2365010, at *5 (Tenn. Ct. App. May 31, 2017) (quoting *In re Malaki E.*, No. M2014-01182-COA-R3-PT, 2015 WL 1384652, at *9 (Tenn. Ct. App. Mar. 23, 2015)) (citation omitted).

It is not solely the Department's responsibility to establish a suitable home for Mother; she must make reasonable effort as well. *See In re Matthew T.*, No. M2015-00486-COA-R3-PT, 2016 WL 1621076, at *7 (Tenn. Ct. App. Apr. 20, 2016). When a parent is aware that her child is in the Department's custody, the Department's efforts may be found to be reasonable if its efforts "equal or exceed the efforts of the parent or guardian toward the same goal." Tenn. Code Ann. § 36-1-102(1)(A)(ii)(*c*); *see also In re Matthew T.*, 2016 WL 1621076, at *7.

When Mother was arrested in April 2018, Father was incarcerated for another offense and DCS was unable to find another family member to take custody of Meghan. The juvenile court issued a temporary bench order that day finding that probable cause existed to believe Meghan was dependent and neglected and ordering Meghan to be placed

in the temporary custody of DCS because there was "no less drastic alternative to the removal of the child from the home." The trial court found that "due to the emergency nature of the child's condition or other circumstances, the lack of preventative efforts was reasonable." The Department thus established the first two requirements of the termination ground of abandonment by failure to provide a suitable home. *See* Tenn. Code Ann. § 36-1-102(1)(A)(ii)(*a*), (*b*).

Ms. Hill was the FSW when Mother was arrested. Ms. Hill testified that Mother's "drug issues" prevented Meghan from returning to Mother's custody. When asked about the Department's efforts to assist Mother with providing a suitable home for Meghan, Ms. Hill responded:

> DCS assisted with paying for the parents to have a mental health assessment and A&D assessment while they were incarcerated through Covenant Counseling. We - - I also provided the parents with a phone number for Covenant Counseling to continue the recommendations of those assessments once they were released from jail.

We have found that a parent's compliance with counseling recommendations may be "directly related to the establishment and maintenance of a suitable home" because the problems and conditions towards which the counseling is focused "address matters which make the home environment suitable for raising children and which keep them from becoming dependent and neglected." *In re M.F.O.*, No. M2008-01322-COA-R3-PT, 2009 WL 1456319, at *5 (Tenn. Ct. App. May 21, 2009).

Ms. Hill stated that Mother was living with a grown daughter in LaFollette during part of the time Ms. Hill was the FSW but that this daughter "had a history of assaultive behaviors." This home, therefore, would not have been a suitable place for Meghan to live. Ms. Hill testified that DCS did what it could to assist Mother to satisfy the A&D recommendation of enrolling in an IOP by providing the phone number of an individual who could enroll Mother in an appropriate program. She stated that Mother's mental health assessment resulted in a recommendation for individual therapy. Ms. Hill did not know whether Mother began individual therapy or not.

Ms. Ford testified that shortly after she took the case over from Ms. Hill in early August 2018, she tried to complete a home visit. She was unsuccessful, however, because the address Mother had given her was incorrect. No apartment was located at the address Mother gave Ms. Ford. Ms. Ford asked Mother for a home address during a CFTM meeting on August 23, 2018, and Mother responded that she did not know the address but would ask the landlord. Ms. Ford testified that she did not have regular contact with Mother. Mother participated in the CFTM on August 23 by phone, and Ms. Ford did not have contact with Mother again until November 2018.

- 12 -

The trial court found that Mother testified that she "did not complete anything to provide a suitable home for the child during the first four months after the child was removed" and that Mother "never completed the domestic violence classes as required" under the first permanency plan. Concluding that DCS established the ground of abandonment by failure to provide a suitable home by clear and convincing evidence, the court wrote:

> The mother did not have a suitable home. FSW Hill testified that [Mother] did not complete random drug screens when requested by DCS. FSW Crystal Hill testified that she had to drive [Mother] to and from visits with the child [during the first few months after Meghan's removal from Mother's custody] because she did not have transportation. Instead of providing a suitable home for the child, [Mother] got into an abusive relationship . . . . A year after the removal of the child from the home, [Mother] remains homeless and continues to have substance abuse issues.

The record supports the trial court's findings of fact. Despite the Department's efforts to provide Mother with services so that she could establish a suitable home for Meghan, Mother failed to follow through with the recommendations. When DCS tried to make home visits, Mother either failed to provide the FSW with an accurate address or told the FSW she did not know her address and would have to ask the landlord. Mother then failed to provide the FSW with an address so that the FSW could make a home visit.

Providing a suitable home for Meghan was a requirement under each of the permanency plans, yet when DCS asked Mother what it could do to assist her to meet any of the permanency plan's requirements, Mother did not ask for any help with obtaining a home before the petition to terminate her rights was filed. *See* Tenn. Code Ann. § 36-1-102(1)(A)(ii)(*c*). Mother was unable to point to any efforts she made towards providing Meghan with a suitable home, and we find that the efforts by DCS exceeded any efforts by Mother to achieve this goal. *See id.* Finally, the evidence demonstrated that "it appear[ed] unlikely that [Mother] [would] be able to provide a suitable home for the child at an early date." *Id.* We conclude that the evidence supports the trial court's determination that DCS established each element of the ground of abandonment by failure to provide a suitable home by clear and convincing evidence.

### 3. Substantial Noncompliance with Permanency Plans

The termination of parental rights statute identifies substantial noncompliance with permanency plans as a ground for termination. *See* Tenn. Code Ann. § 36-1-113(g)(2). Terminating a parent's rights for this reason requires the petitioner to show, initially, "that the requirements of the permanency plan are reasonable and related to remedying the conditions that caused the child to be removed from the parent's custody in the first place." *In re M.J.B.*, 140 S.W.3d 643, 656 (Tenn. Ct. App. 2004) (citing *In re Valentine*, 79 S.W.3d

at 547, and *In re L.J.C.*, 124 S.W.3d 609, 621 (Tenn. Ct. App. 2003)); *see also* Tenn. Code Ann. § 37-2-403(a)(2)(C) ("Substantial noncompliance by the parent with the statement of responsibilities provides grounds for the termination of parental rights . . ."). If the trial court fails to make a finding regarding the reasonableness of the parent's responsibilities under the permanency plan, the reviewing court must review this issue de novo. *See In re Valentine*, 79 S.W.3d at 547.

The petitioner must then demonstrate "that the parent's noncompliance is substantial in light of the degree of noncompliance and the importance of the particular requirement that has not been met." *In re M.J.B.*, 140 S.W.3d at 656 (citing *In re Valentine*, 79 S.W.3d at 548-49, and *In re Z.J.S.*, No. M2002-02235-COA-R3-JV, 2003 WL 21266854, at *12 (Tenn. Ct. App. June 3, 2003)). "Substantial" has been defined as "[i]mportant, essential, and material; of real worth and importance." BLACK'S LAW DICTIONARY (11th ed. 2019).

The initial permanency plan, dated May 3, 2018, is not in the appellate record, but Ms. Hill testified about the requirements of this plan. The plan required Mother to complete A&D and mental health assessments and to follow the recommendations of each assessment. Moreover, as Ms. Hill testified, Mother was required to complete the following:

> Random drug screens. And I did call the mom in for a random drug screen and she failed to show. Maintain stable housing, legal income, stable or reliable transportation, no further legal activities, parenting classes, attend all court hearings and follow all court orders, a hundred dollars of child support each month. Of course, monthly visitation with Meghan and complete domestic violence classes.

The second and third plans are included in the record. These later plans are dated December 4, 2018, and May 14, 2019.

The second plan required Mother to complete the following steps: (1) pay child support of $100 per month; (2) address her substance abuse problems by completing an A&D assessment and following all recommendations, submitting to random drug screens, and completing domestic violence classes and following all recommendations; (3) maintain her mental health by completing a mental health assessment and following all recommendations; (4) obtain a safe and stable environment free of domestic violence, drugs, and abuse by acquiring and maintaining stable housing and updating DCS of any telephone and address changes; (5) have legal income to support Meghan by obtaining reliable transportation and ensuring Meghan is safe at all times; (6) obtain skills to parent Meghan properly by attending parenting classes and providing proof of class completion to DCS; (7) resolve all legal concerns by attending all court dates and hearings and following court orders and refraining from engaging in any further illegal activities; (8)

remain current on all child support orders; and (9) maintain a bonded relationship with Meghan. The third permanency plan included many of the same requirements as the second plan. In addition, it stated that Mother admitted to using methamphetamine in April 2019 and that she sought help at that time to find a shelter/rehabilitation. It also stated that Mother alleged she was a victim of domestic violence.

The trial court ratified all three plans and found that the requirements of each plan were "reasonable, related to remedying the conditions that necessitate[d] foster care, and in the child's best interest." In addressing this ground for termination, the trial court wrote:

> The mother completed an alcohol and drug assessment but did not follow the recommendations. The mother has not addressed her drug abuse at all. The mother did not complete a mental health assessment and recommendations. The mother did not have stable housing, transportation, and income. The mother did not comply with random drug screens. The mother did not remain in contact with DCS. The mother did not participate in visitation with the child. The mother did not complete domestic violence classes. The mother did not complete parenting classes. The mother did not pay child support. Therefore, the mother was in substantial noncompliance with the permanency plan.

The record supports these findings. Mother does not contend that she completed any of the requirements under the plans, and she does not dispute that the steps she was required to complete under the plans were reasonable and related to the reason Meghan was removed from her custody. Instead, she argues that the trial court failed to specifically find that the plan requirements were reasonable and related to conditions that necessitated foster care placement. However, the trial court made this finding each time it held a permanency hearing to approve the permanency plans; these hearings took place on June 13, 2018, December 5, 2018, and May 29, 2019. We affirm the trial court's determination that the evidence clearly and convincingly established that Mother was in substantial noncompliance with the permanency plans.

### 4. Persistence of Conditions

A parent's rights may be terminated when the parent fails to remedy the conditions that caused removal of the child and there is little likelihood that the parent will remedy those conditions in the near future. *See* Tenn. Code Ann. § 36-1-113(g)(3)(A). The proof required to establish this ground for termination is as follows:

> The child has been removed from the home or the physical or legal custody of a parent or guardian for a period of six (6) months by a court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and:

- 15 -

(i) The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent or guardian, or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent or guardian;

(ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or guardian in the near future; and

(iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home.

Tenn. Code Ann. § 36-1-113(g)(3)(A).

The termination statutes recognize that a child needs "a permanent, stable environment." *In re Eddie F.*, No. E2016-00547-COA-R3-PT, 2016 WL 7029285, at *7 (Tenn. Ct. App. Dec. 2, 2016) (citing *In re K.A.H.*, No. M1999-02079-COA-R3-CV, 2000 WL 1006959, at *5 (Tenn. Ct. App. July 21, 2000)). The purpose behind the persistence of conditions ground is "'to prevent the child's lingering in the uncertain status of foster child if a parent cannot within a reasonable time demonstrate an ability to provide a safe and caring environment for the child.'" *Id.* (quoting *In re Dakota C.R.*, 404 S.W.3d 484, 499 (Tenn. Ct. App. 2012)).

Addressing this ground for termination, the trial court wrote:

[T]he Court finds that there is clear and convincing evidence that the conditions which led to the removal persist to this date. The child was initially removed from the parents due to homelessness and substance abuse. Other conditions in the home exist that, in all reasonable probability, would lead to further neglect or abuse of the child in that [Mother] [has] failed to address [her] substance abuse and [she] has also demonstrated a lack of stability. There is little chance that those conditions will be remedied soon so that the child can be returned safely to the home because, for eighteen months, DCS made reasonable efforts . . . to help [Mother] remedy them, to no avail. Continuation of the parent/child relationship greatly diminishes the child's chances of being placed into a safe, stable and permanent home.

The evidence shows that Meghan was removed from Mother's custody by a juvenile court order finding she was dependent and neglected more than six months before DCS filed the termination petition, as the statute requires. According to the third permanency plan, Mother informed Ms. Ford (or someone else from DCS) that she had used

methamphetamine in April 2019, a year after Meghan was removed from Mother's custody, that Mother needed help finding a shelter, and that she was a victim of domestic violence. On June 9, 2019, Mother was arrested and charged with theft of property. By the time of trial, Mother was receiving therapy, but she still had not begun to address any substance abuse issues. Despite receiving three different recommendations for IOP treatment from three different A&D assessments, Mother refused to acknowledge that she had a substance abuse problem. At trial Mother stated that she was living with her mother but that she had plans to move into an apartment. No proof was offered, however, that this apartment would be suitable for Meghan. Mother testified that she was engaged to the same man she had previously told Ms. Ford mistreated her and who had caused her to seek refuge in a domestic violence shelter.

The record does not indicate that Mother has remedied the conditions that caused Meghan to be removed from her custody or that she is likely to remedy the conditions anytime soon. At the time of trial, Meghan was happy in the home of a foster mother who was interested in adopting her. Continuing the mother/child relationship would greatly diminish Meghan's opportunity to be integrated into the safe, stable, and permanent home her foster mother was offering to provide. We agree with the trial court's determination that DCS established the persistence of conditions ground of termination by clear and convincing evidence.

5. Failure to Manifest an Ability and Willingness to Assume Custody

Parental rights may be terminated when the evidence clearly and convincingly shows the following:

> A parent or guardian has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child.

Tenn. Code Ann. § 36-1-113(g)(14). This ground for termination requires DCS to prove two elements by clear and convincing evidence:

> First, DCS must prove that [the parent] failed to manifest "an ability and willingness to personally assume legal and physical custody or financial responsibility of the child[ren]." Tenn. Code Ann. § 36-1-113(g)(14). DCS must then prove that placing the children in [the parent's] "legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[ren]." *Id.*

*In re Maya R.*, No. E2017-01634-COA-R3-PT, 2018 WL 1629930, at \*7 (Tenn. Ct. App. Apr. 4, 2018). We have addressed the meaning of the phrase "substantial harm" in the parental termination context as follows:

> The courts have not undertaken to define the circumstances that pose a risk of substantial harm to a child. These circumstances are not amenable to precise definition because of the variability of human conduct. However, the use of the modifier "substantial" indicates two things. First, it connotes a real hazard or danger that is not minor, trivial, or insignificant. Second, it indicates that the harm must be more than a theoretical possibility. While the harm need not be inevitable, it must be sufficiently probable to prompt a reasonable person to believe that the harm will occur more likely than not.

*Ray v. Ray*, 83 S.W.3d 726, 732 (Tenn. Ct. App. 2001) (footnotes omitted).

The trial court concluded that DCS proved this ground by clear and convincing evidence, stating:

> [T]he Court finds that there is clear and convincing evidence that [Mother] has failed to manifest an ability and willingness to assume legal and physical custody of the child. . . . It has been eighteen months since the child was placed in DCS custody. [Mother] has failed to demonstrate stability and the ability to appropriately and safely parent the child during [her] visits with her. Placing the child in the mother's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child. She has an unaddressed substance abuse issue and no stable home to which the child could return.

We agree with the trial court's assessment that the evidence clearly and convincingly demonstrated that Mother failed to manifest a willingness and an ability to assume legal and physical custody of Meghan and that placing her in Mother's legal and physical custody would pose a risk of substantial harm to her physical and psychological welfare. Although Mother testified that she wanted to resume custody of Meghan because she was her mother and she loved her, the trial court's findings regarding Mother's failure to address her substance abuse, her lack of housing, her lack of income, her failure to maintain contact with DCS, her failure to visit with Meghan on a regular basis, and her arrest in Loudon County are all supported by the record by clear and convincing evidence and point to the contrary. *See In re A.V.N.*, No. E2020-00161-COA-R3-PT, 2020 WL 5496678, at \*11-12 (Tenn. Ct. App. Sept. 10, 2020). The testimony by FSW Ford and Meghan's foster mother, and Meghan's letter to the trial court judge, constitute clear and convincing evidence that returning Meghan to Mother at this point would pose a risk of substantial harm to her physical and psychological welfare. We affirm the trial court's termination of Mother's rights on this ground.

B.  Best Interest Analysis

After concluding that clear and convincing evidence existed to terminate Mother's parental rights, the trial court conducted a best interest analysis and determined that it was in Meghan's best interest for Mother's rights to be terminated.  *See* Tenn. Code Ann. § 36-1-113(c)(2); *In re Audrey S.*, 182 S.W.3d at 860.  The factors a trial court is to consider in determining whether terminating a parent's rights is in a child's best interests are set forth in Tenn. Code Ann. § 36-1-113(i).  They include the following:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

"Facts relevant to a child's best interests need only be established by a preponderance of the evidence, although DCS must establish that the combined weight of the proven facts amounts to clear and convincing evidence that termination is in the child's best interests." *In re Carrington H*., 483 S.W.3d at 535 (citing *In re Kaliyah S.*, 455 S.W.3d at 555). Courts are not to conduct a "rote examination" of the factors set forth in the statute to determine whether or not the factors add up to favor a parent. *In re Audrey S.*, 182 S.W.3d at 878. Rather, "[t]he relevancy and weight to be given each factor depends on the unique facts of each case," and "depending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." *Id.* (citing *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004)). The best interests of a child "must be viewed from the child's, rather than the parent's, perspective." *In re Audrey S.*, 182 S.W.3d at 878. When the best interests of a child conflict with those of the parent, "such conflict shall always be resolved to favor the rights and the best interests of the child." Tenn. Code Ann. § 36-1-101(d).

The trial court addressed each of the best interest factors as follows:

1. It is in the child's best interest for termination to be granted because [Mother] [has] not made changes in [her] conduct or circumstances that would make it safe for the child to go home. [Mother] continue[s] to use illegal drugs, [has] not maintained consistent visitation with the child, and has not maintained stable housing.

2. It is in the child's best interest for termination to be granted because [Mother] [has] not made lasting changes in [her] lifestyle[] or conduct after reasonable efforts by the state to help, so that lasting change does not appear possible. Despite help from the state as described above, [Mother] continue[s] to use illegal drugs, [has] not recently maintained consistent visitation with the child and has not maintained stable housing.

3. It is in the child's best interest for termination to be granted because [Mother] [has] not maintained regular visitation or other contact with the child.

4. It is in the child's best interest for termination to be granted because the changing[of] caregivers at this stage of her life will have a detrimental effect on her. She has done well in the foster home. She is loved and is bonded to the foster parent who wishes to adopt her.

5. It is in the child's best interest for termination to be granted, because [Mother] [has] abused or neglected the child.

[6]. It is in the child's best interest for termination to be granted because there is crime in [Mother's] home. [Mother] [has] continued to incur new criminal charges.

[7]. It is in the child's best interest for termination to be granted because [Mother] abuse[s] drugs, rendering [her] consistently unable to care for the child in a safe and stable manner.

[8]. It is in the child's best interest for termination to be granted because [Mother's] mental or emotional state would be detrimental to the child and would prevent [her] from effectively parenting the child.

[9]. It is in the child's best interest for termination to be granted because [Mother] [has] shown little or no interest in the welfare of the child.

Mother introduced evidence that, after not seeing Meghan for several months, she began visiting Meghan again in the spring of 2019 and had three visits between May and the date of trial on October 11, 2019. Although Mother enjoyed the visits, Meghan's foster mother testified that the visits were difficult for Meghan and made her anxious. Ms. Ford testified that Meghan told her that she did not want to see her parents because she was not "comfortable." Ms. Ford explained:

[Meghan] had tried to call them five months in a row and nobody would answer the phone or they didn't have time. And [Meghan] said it was easier to not call than to call them and not get an answer.

We conclude that the trial court's findings concerning Meghan's best interest is supported by the record and that the evidence clearly and convincingly demonstrates that it is in Meghan's best interest to terminate Mother's parental rights. As a result, we affirm the trial court's termination of Mother's parental rights to Meghan.

IV. CONCLUSION

We affirm the trial court's judgment terminating Mother's parental rights. Costs of this appeal shall be taxed to Mother, P.R., for which execution shall issue if necessary.

_____
ANDY D. BENNETT, JUDGE